We will now hear argument in the case of Bernstein v. Virgin America. This case, the argument at least, is consolidated case number 19-15382 and 20-15186. That's for the request of the parties. Let's see, and we've also got a vision of time. The appellants, as I understand it, let's see, Mr. Doversky, I apologize, I've said that wrong. You have 25 minutes, and then the government is taking 5 minutes over 30 minutes of your time. Is that correct? That's right, Your Honor. Okay, and then for Mr. Bernstein and the courted class, Mr. Cooper has 20 minutes, and Ms. Olivier has 10 minutes. Is that correct? That's correct, Your Honor. Very well. Okay, let's start with the appellants then. Mr. Doversky, I apologize, DeVore Tursky, is that how you say it? Good morning, Your Honor. It's Cheyne Tursky on behalf of the appellants. The district court in this case awarded $80 million based on its view that California law applied to any work performed in California by group and flight attendants, and to all work performed elsewhere by California resident subclass members. I thought it might be helpful at the outset to break down the components of that judgment, because there are a number of issues in this case, and I thought that roadmap might be a helpful way to emphasize the particular issues that I'd like to focus on. $41 million out of the nearly $80 million judgment is attributable to the minimum wage compliance claim. That's one of the issues I'd like to focus on, given the magnitude of the claim, and also the significance of the California Supreme Court's decision in Oman recently, which calls for reversal of the judgment on that claim. Second, around $1.5 million of the judgment is attributable to the meal and rest break claims. While that's a relatively small monetary component of the judgment, it creates huge compliance issues for the airlines, and I'd like to focus on that issue as well, because those claims are preempted by federal law. In addition to that, about $12 million are attributable to the wage statement claims. The California Supreme Court in Ward expressly rejected the Bernstein District Court's test that it applied for those claims. Around $11 million attributable to the overtime claims. The decision in Ward from the California Supreme Court likewise undermines Judge Taigar's analysis of those claims. And then around $11.5 million in other derivative claims, and about $6 million in attorney's fees. Of course, there's a Dormant Commerce Clause overlay on top of all of this, which I'm happy to discuss and hope that we have some time for. But at the same time, I also recognize that the Court doesn't need to reach that constitutional question if it agrees with us on the other issues that I've raised. Let's just say, arguably, if we determined that the Dormant Commerce Clause would allow the application of California law, should we certify the question to the California Supreme Court like we did in Sullivan? I don't think there's any need to do that here, because the California Supreme Court has recently answered a certified question in Ward. Now, that was, of course, about the Section 226 claims, but the California Supreme Court provided a lot of guidance there. In addition, the California Supreme Court recently answered a certified question about that. Judge Teigar on the minimum wage claims said that California law prohibited wage averaging. The California Supreme Court in Oman said the opposite. Averaging is permissible. What's not permissible is borrowing. The difference comes down to a matter of contract. If the employee is promised certain pay for a certain period of time, then the employee is deemed to be paid for all hours worked within that period. And there's no problem with translating that compensation into an hourly rate across the period. That is true under Oman, even if there are on-duty periods that the employer's pay formula doesn't directly compensate. Borrowing, by contrast, is what occurs when the employer reneges on a contract. Here, there are three key sites in the record that the wage payment plan was permissible in light of Oman. They are Excerpt of Record 1225, Excerpt of Record 1187 to 1189, and Excerpt of Record 281. Let me walk through, if I could, the significance of each of those three sites. Excerpt of Record 1225 promises employees certain amount of, quote, total pay for a bid period, end quote. That's, again, Excerpt of Record 1225. So that's explaining to employees that this is the total amount that they will get for everything they do in that bid period. In turn, Excerpts of Record 1187 to 1189 explain to employees what their report and release times are, and those pages make clear that employees are expected to show up a certain amount in advance of a flight and to stay for a certain period of time after a flight. So that is what they are being compensated for when they're being compensated for the bid period. And then, of course, there's a formula. This is spelled out at 1225, ER 1225 to 1242, in which in each bid period, a flight attendant's total pay credits consist of multiplying the total pay credit times the base rate of pay, subject to a minimum guarantee for that bid period. The last key site here is Excerpt of Record 281, and the significance of that is that it shows that based on this approach, based on this formula, the class members earned more than the California minimum wage 99.98 percent of the time. The only way that the district court got to a $40 million, $41 million windfall here was based on a technicality. And the technicality is that the way the formula is set up, the credits are earned for certain periods of time, but not for others. And the hourly rate for those periods of time is at a higher hourly rate than it otherwise would be in order to account for that kind of a system. But the district court in this case said that that same higher hourly rate had to apply to the other periods of time that were not expressly compensated under the formula. And why do all... If I may, I appreciate what you just said, and I've got notes on that. I want to ask you, are there any California state court cases determining whether California Labor Code Sections 201, 202, and 203 apply to residents who work outside of California or a California employer? So, I think what the California Supreme Court said in Ward was that for each particular statute, you're going to have a different analysis. Oh, I get that. But I'm just asking, are there any cases that deal with 201, 202, and 203 of the California Labor Code for residents who work outside of California, but for a California employer? So, I'm not sure of the answer to that question. Let me double check. I'll let somebody add to that Section 510, which deals with overtime. If there are any such cases, we'd appreciate knowing what they are. Okay. Let me double check for you and get you on the rebuttal exactly which cases are dealing with which particular provisions. But I think with respect to the other claims in the case beyond minimum wage, the court doesn't have any questions on the minimum wage compliance point. With respect to 226, that's the wage statement claim, the Supreme Court in Ward expressly disagreed with Judge Tygar's multi-factor analysis and said that the question for the applicability of California law for a wage statement claim is twofold. First, does the employee work the majority of the time in California? And if no, just for a wage statement claim, does the employee present for work in California and perform some work there? The plaintiffs in this case have never tried to make that shown with respect to the class members here. And in fact, within the record, the key citations for this are excerpts of record 247. The class collectively work only 31.5% of its time in California and work outside of California 84.5% of the days within the class period. In order to conduct the sort of inquiry that Ward requires for these section 226 claims, you would have to have individualized inquiries by class members about where they spent their time and where they presented themselves for work. And they didn't all present themselves for work in California. We know that because the names pointed, Ms. Bernstein usually presented herself for work at JFK, rather than at JFK Airport in New York, rather than in California. And you're arguing then about the commonality aspect of the class? Is that what you're arguing? It's both, well, I'm making both a substantive argument that Judge Tygar erred in applying California law to the entire class without asking these questions that Ward now requires. And then second of all, these are individualized questions that if they are to be asked, can't be asked on a class-wide basis because you have to go flight attendant by flight attendant and time period by time period. Let me answer this. My recollection is that the contracts that were entered into by the potential class members, perhaps universally, at least that's my assumption, would be decided under California law. Does that make a difference in this case? I don't think it does. The fact that an agreement will be decided under California law doesn't mean that California substantive law is going to govern the entire working relationship in this kind of a situation where you're talking about work that is inherently interstate in nature and where you have flight attendants who are performing only small amounts of time, small amounts of work in California at any given time. So your position is that the fact that the, in this case, obviously, the employer wrote the contract. I suspect there was precious little bargaining. The fact that the employer put in there that the law would be the contract and California law does not address the fact that since many of these people were working a good part of their time outside of state, that somehow other law would apply. Is that what you're saying, Reed? We have to look at conflicts of law? Is that what we're saying here? Well, you can have a contract that is governed by California contract law. That doesn't mean that the entire body of California wage and hour law is what's been selected to apply to that. Well, if, again, I'm just trying to understand the scope of it. Since the employer drafted the contract and we construe contracts basically against the drafter, if there is no, if you will, negotiation by people that are in similar economic circumstances, don't we construe the contract against the employer and apply it in a broader sense than you are suggesting here? I think that would be a very sweeping construction of a choice of law clause or of the clause that you're envisioning in a way that nobody ever understood at the time, and really nobody had understood before these sorts of lawsuits started to be filed, that California law, that one state's law, would apply the work of interstate flight events. If there was that kind of a commitment being made, you would expect to have some evidence of that, both in the contract itself and in the surrounding circumstances, but that's just entirely lacking here. All right, but is it your position that probably any of your employees even read the contract? Whether any of the employees read the contract? Yeah. In other words, they were given this printed form. They've decided probably, didn't they? Did they analyze it in the face of a lawyer? Is there any evidence in the record about that? I don't know that there's evidence in the record of that, but I don't think we should assume that people never read their contract. This is an employment contract. This is not just like the fine print on the back of an airline ticket or something. This is an actual employment contract. I think we should assume that people pay some attention to that. I don't quite understand your answer. I was intrigued by what my colleague was talking about, that the parties could say California law applies and they apply it. I think your answer is, yeah, okay, but in California, but I thought that was the purpose to get a uniform process. What is the difficulty, as indicated by my colleague, of saying that California law applies to these issues? I don't see anything in Oman or Ward that is counterdicts that. I think if a contract simply says California law applies to the employment relationship, that's invoking California contract law principles, that if the employer promises to pay you X and instead pays you something else, that the contract is going to be interpreted under California law principles for that purpose. That's not applying the entire body of substantive California law, including wage and hour law, to all work that is performed anywhere in the country. Can't the parties make that distinction? It can't apply. Is it impossible to apply or can the parties enter into agreement that it doesn't? In theory, perhaps you could enter into such an agreement, but I do think it's important to understand just how incredibly difficult it actually would be in practice to apply Why is that our problem? If the parties can enter into it, they can enter into anything, but we wouldn't say, well, now we're not going to count this part because that's incredible and you were stupid to enter into it. Well, but I think the enormous difficulty of applying such a provision counsels against finding that that was what the party intended, absent some evidence that they meant such a sweeping change from how employment law for airline employees has always been understood. In order to affect that kind of a change in a contract, you would expect clearer language and some sort of history surrounding the implementation of that. But you're assuming that these employees are a bunch of lawyers. I doubt they gave any thought to it at all. And is it not your responsibility to show that if there's a carve out in the application of California law, it should have been put in writing. Is there any evidence to suggest that any of the employees were experts in federal preemption law or anything of the sort that would have enabled them to determine that California law was not going to apply across the board? Judge Smith, I'm not assuming that the employees are lawyers, but I am assuming in this change in employment practices that have always been understood in the industry, that it would not make that change lightly and would make clear that that's what it was committing to. Well, maybe the airline's lawyers were not very careful. I suspect, I've never seen this, but I suspect if you go back to the very beginning, you would find that virtually all of the contracts referred to California law and probably nobody ever thought of that. And if that's the case, doesn't that put the burden on your client to distinguish why someone would have understood that something other than California law would apply? Judge Smith, at this point, I just don't know that the record reflects that kind of clear California choice of law provision. But even if it did, I don't think that the burden is on the airline to show that it didn't intend this kind of a sea change. What burden is it? Is it the burden of the class or the individual employees as to what they understood it to mean? Well, I think you would want to look at the surrounding circumstances surrounding the contract. And you would expect to see some evidence, again, either in clear history because this particular contract wasn't collectively bargained, but somehow in the surrounding circumstances of the history that led to the contract, that what was intended was this kind of an enormous obligation and a sea change in how airline employees are compensated. This has simply never been understood to be the way that it's done, or compensated and also regulated. And I see the clock is running down. I would, if I could, like to reserve about five minutes for rebuttals. I'm not quite out of time. Please help me with this. You've got seven minutes, 38 seconds, roughly. Is that just your time, the separate time of Ms. Utrecht? It's on a different clock, right? That's correct. Of my seven and a half minutes, if I could try to reserve that time. Oh, no, you can. I'll place it. So, with respect to maybe to introduce the argument that Ms. Utrecht will be making with respect to the meal and rest break preemption claims, the preemption of the meal and rest break claims, those claims are preempted by federal law in three different ways. First, the California meal and rest break rules conflict with federal law. Federal law authorizes airlines to assign flight attendants for duty periods of up to 14 hours to be followed by a nine-hour break. California law conflicts with that by requiring that breaks be given every four to five hours. So, California law is specifically requiring or specifically contradicting federal law on that point. In addition to that, providing these sorts of short breaks in the middle of a duty period would interfere with the safety responsibilities that flight attendants are required to perform under federal law. Federal law requires them to be available at any time during their duty period in order to perform their safety responsibilities. But California law requires that when they are on their short breaks, they not be subjected to any requirements by the employer. So, you have conflict preemption as a result of that. Second of all, there's also field preemption because the FAA regulations speak specifically to the question of meal and rest breaks for flight attendants. Does your argument find its major support in field preemption? You're not arguing, I gather, that you would also be entitled to conflict preemption. We're arguing conflict preemption because federal law specifically authorizes a duty period of up to 14 hours. California law prohibits that. So, it requires breaks every four to five hours. So, California law is specifically prohibiting what federal law authorizes. It's also interfering with the safety responsibilities that airline flight attendants have to perform. Field preemption is because the regulations speak specifically to this. ADA preemption is because of the effect on prices, routes, and services of having to either provide these breaks or, as the district court suggested, address the problem by adding additional flight attendants. Okay. You want to save the balance of your time, I believe? If I could, thank you, Your Honor. Uh-huh. Very well. So, we'll hear then from Ms. Utrecht, please. Good morning, Your Honor. My name is Jennifer Utrecht on behalf of the United States. As Mr. Zebrowski mentioned, I'm here to address a single question, which is whether California's mail and rest break laws are preempted specifically by the Airline Deregulation Act as applied to flight attendants. It's important to note at the outset that the statutory express preemption provision at issue, the Airline Deregulation Act, has an expansive scope. Both the Supreme Court and this court have recognized the preemption of all laws related to prices, routes, and services of air carriers means any law that not only has a reference to but may even have an indirect connection with airlines. Counsel, can I ask, which specific portions of the California laws do, as the United States believes, are preempted? Which ones? I know you say meal and rest claims. What else? So, we have only opined as to meal and rest breaks in this litigation. And so, that is, we're not, that is not to say that any other laws may or may not solely to say that the FAA and Solicitor General have authorized the United States position on this limited issue, which is that the 30-minute meal break and the 10-minute rest break requirements are preempted by the Airline Deregulation Act. But then, for purposes of this litigation, it's just the meal and rest claims that you're focusing on, right? Is that right? Yes. Yes, Your Honor, I'm sorry. I believe there was a bit of lag in the speaker connection. I understand. Yeah. Just the meal and rest break claims, Your Honor. The district court in this case found that the meal and rest break laws were not preempted under the Airline Deregulation Act because of this court's holding in DILT, which was a case about how those same state laws apply to motor carriers. But that case is not controlling here, and it's important, then that's really critical to the analysis because mandating duty-free breaks, entirely off-duty breaks, as California law requires for flight attendants is quite different than mandating duty-free breaks for motor carriers because of the substantial differences between the airline industry and the motor carrier industry. Those differences require independent attention, and for that reason, the United States believes that the district court in holding this case was controlled by DILT. So as mentioned in our amicus brief, the district court contemplated that sort of the compliance with California's laws could be achieved using the same sorts of strategies that this court said would work for motor carriers in DILT. So you could hire additional flight attendants, or you could have delays in between stops, but that doesn't work for the airline industry because of the very tightly choreographed and coordinated nature of air travel. There's limited runway space. There's environmental hazards. Flights take off at very specific times. Otherwise, there are ripple effects, snowball effects throughout the country of other delays. So delaying flights, of course, is going to have a direct effect on services, the same kind of significant direct effect that is forbidden by the Airline Deregulation Act. And hiring additional flight attendants also doesn't solve this problem because hiring additional flight attendants, if you staggered flights, you would be leaving flight attendants in cities that aren't their home base. You would be having an issue where airlines would have to send a new flight to pick them up and take them home, and that's forcing airlines to have additional services, services that the competitive market forces might not otherwise require. These are exactly the sorts of situations that Congress wanted to prevent state laws from interfering in competitive market forces, being the driving factor behind airline prices, routes, and services. Can I ask you a question? Would you mind? Is the government now providing rules and regulations in these areas? With respect to breaks, Your Honor, I'm sorry. What is the- With respect to the issues that you are talking to us about, does the government now have rules and regulations governing those areas? There are federal hours of service regulations for airlines. So there are maximum amounts of hours that airlines, or that flight team can spend on duty. There is a maximum amount, that flight attendants have to spend between duty periods entirely off duty. Yes, Your Honor, there are regulations broadly in the hours of service area, if that's Your Honor's question. So the government is in a position, I take it, to take over the whole airline issues. We will do away with state control if they go outside the state. I- I- There is certainly room with respect to the federal government regulations with respect to safety and air for the government to pass regulations involving breaks. Yes, on that, to the extent that it relates to airline safety, then yes, there is room in the federal regulatory authority. It just seems to me that if you take your position, you have to take it all. You couldn't take part. And as the government, some things in some areas, I suspect the government would just assume that the states handle on a local basis. But you're indicating that the United States government has already swept the field and there's no room for anything for airlines to do if they go outside the state. Is that your position? No, Your Honor. So again, the United States position here is specifically that under the Airline Deregulation Act, which prohibits states from enact- which preempts any law that's related to prices, routes, and services, that the state- that California's meal and rest break laws are preempted. And that's because California's meal and rest break laws mandate off-duty breaks. And it's this off-duty nature of these breaks that would have a significant effect on prices, routes, and services. And it's because of that direct connection that there's a problem. You know, a different state's law with different breaks would be analyzed separately, but it's just really this unique requirement that off-duty breaks have to happen at specific times that causes this prohibited effect on prices, routes, and services under the nature of this law and this preemption provision. I'm well off time, Your Honor, but I'm happy- Do either of my colleagues have additional questions? I don't want to interrupt Judge Wallace if he has additional questions. I'm through. I'm through. How about Judge Lasnik? Any questions? No. No questions. Very well. Thank you. So, we'll be hearing from Mr. Zorbovsky in a few minutes, but let's now hear from- I guess Mr. Cooper is going to start for 20 minutes, and then Ms. and all of you after that. So, Mr. Cooper, let's hear from you now. That's right, Your Honor. Thank you very much. Good morning, and may it please the Court, Charles Cooper. And I have to say that, as you can plainly see, I'm about to know one in the gray hair department. We've already identified- In color? In color or a mouse? Perhaps you, Judge Wallace. Perhaps you. Ms. Olivia and I are going to also divide the labor with the time. I'm going to address the Ward-Omon issue and the applicability of California law. Those are the claims here. The Dormant Commerce Clause, if there are any questions about that, and the preemption issues. My colleague, Ms. Olivia, is going to address whether the California law is actually or violated if they apply. Class certification issues and attorney's fees issues, if there are any. Let me open, Judge Smith, with your question about conflicts of laws and the contract provision that identifies California law. Be honest with you, and my co-counsel may be able to address this. I'm not familiar with that particular- Both of you will be honest. Of course, Your Honor, of course. But, Your Honor, a typical choice of laws provision certainly governs if there is a claim and a dispute that some other state, some state's laws apply as opposed to California's. Unless, I will submit, unless there is some overarching superior law that makes it illegal for California laws to be applied. For example, counsel from the Justice Department just made a case for that proposition with respect to meal and rest breaks. Well, then California's law can't be applied. But apart from that, you would think that, yes, California law governs the entire relationship, not just- For purposes of our announcement, and I, again, I understand that just because something refers to California law doesn't necessarily cover everything. But when we analyze the fact that California law is said to be the governing law of these employment contracts, do we apply normal contract interpretation law and principles as we analyze those issues? Well, Your Honor, I would think you'd apply them as they are given to you by the California courts, and how the California courts apply their interpretive principles. We have those from Ward and Oman before you, with a specific reference to the provisions that are at issue here, Your Honor. But I want to speak very quickly to these preemption questions that were just, that were just offered. With respect to counsel for the government, my first response to the ADA preemption is built. Your Honor, my backup response to that argument is built. Your Honor, it's simply not, we can find no principle basis on which to suggest you're not bound, this panel is not bound. But counsel, I mean, you know, we all studied the motor, I mean, the flaps issue in law school. And the reality here is that the governor's counsel is absolutely correct, is she not, that there's a big difference between motor carriers and airlines. She pointed out the issue of the land, air traffic control, and the like. Why would built control us in our analysis of preemption issues when the airline industry is so different than typical motor carrier law? Your Honor, I would just submit to you that it's really not different in this context, in the context of the perfect, first of all, the language is identical, virtually, materially identical that governs here, with respect to the preemption issue of both of these statutes, the truckers and the airlines. But the second point I want to make is that with respect to meal and rest breaks, what are their purpose, their purpose are safety, their purpose are to people who are operating these interstate vehicles, if you will, and attending to the needs of passengers or cargo or whatever, that they are properly rested, and that the public safety is, is accounted for. The government's, you know, kind of hip bone connected to the argument for why this affects prices, or why it would affect services, Your Honor, is really just overwhelmed by the, the practical reality that they could, if it was necessary to hire an additional flight attendant, in order to accommodate California law on this, that is something they could do for $100 a flight. Let's assume, arguendo, that I disagree with you about the application of DILTS in this case. What's your next best argument for why the meal and rest breaks are not preempted under the ADA? Just arguendo, that's all. Yes, Your Honor, my next best argument would simply be to offer to you, Your Honor, the same, the same arguments, really, that were found compelling by a panel of this court in the DILTS case. The, the, to say that the pricing of airline services is affected by the requirement that an additional air flight attendant be, be hired would, would essentially eliminate from interstate carriers, certainly the airline industry, almost any kind of requirements that the states would place upon an airline. What about meal and rest breaks for gate, gate attendants and baggage handlers? That's going to require additional cost for the airline? Respectfully, is it a matter of cost, or is it the specific language, as you well know, as an experienced lawyer, when it's very rare for Congress to expressly preempt states. But in this case, the ADA says, and I'm quoting from a part of it, no state shall enact or enforce any law, rule, regulation, standard, or other provision, having the force and effective law relating to rates, routes, or services of any air carrier. Now, that is a specific preemption. Your argument seems to be that rates, routes, or services are either not covered, or that somehow they couldn't possibly have meant to preempt state laws that could in any way impact that. Oh, no, Your Honor. Is that what you're saying? No, Your Honor, I'm saying that those are preempted, and if the state presumes to legislate with direct reference to any one of those things, it would be preempted. But it can't be that that preemption clause is so broad and robust and sweeping. Well, that's what we're going to decide. Well, and my argument to you with respect is that the impact here, the very indirect and attenuated impact of meal and rest breaks on airline services, routes, or pricing simply can't be swept within the preemption. But don't we have to – don't we – are we really looking in this case at the people who are covered by the class? We're not really talking about people at the counters. We're talking about flight attendants, basically. Am I missing anybody that's in the class? They're all flight attendants, right? Yes, of course. They're in a different situation than whether a state can regulate the baggage handler, for example. Here – Why is that? Why is that, Your Honor? Well, I think that's what the district court found and what you proposed as your class, right? Well, that's our class, but my point is simply by analogy, Judge Schmidt. It's simply to say that if the preemptive impact of this would be whether or not the hiring of an additional flight attendant affects pricing or affects services in some way, it seems that the same would be true – and you could say it, perhaps a little bit more attenuated – about gate agents. What? If you could – and it's for pricing. Gate agencies? Is that what you said? Gate agents for the – Oh, I thought you were talking about some kind of dating agency, and I thought, boy, we've really gotten far at screening here. Gate agents, I'm sorry. If I could just switch gears now and address offered by counsel for Virgin, and that relates to Ward and Oman. And, Your Honor, we submit that Ward and Oman very strongly support the district court's application of California law to the claims at issue here. Well, let me ask you this. How is Virgin's paid formula different from the formula at issue in Oman? Your Honor, may I defer that question to my co-counsel? Of course. Of course. Thank you. She's a –  Of course. Okay. Thank you. But to get to the applicability of these laws, let me wind up before my pitch here first. Ward and Oman established nothing else. It is that the key question with respect to applicability of the state laws is what kinds of California connections will suffice to trigger the in light of its real sensitivity to interstate commenting and to the sovereign interest of other states to say that those connections have to be strong enough to ensure that California, in these Ward court's words, is the state that has the most significant relationship to the work at issue, the most significant relationship. And, yes, each law must be – the court was very clear that the test that it developed in Ward for Section 226, the wage statement provision, and for Section 204, the timing of payment provision, wouldn't necessarily govern other provisions. But with respect to those and with respect to the portions of the judgment that are founded on violations of those same provisions, well, then this is a very easy case. It's – the court adopted the base in California test when the flight attendants don't spend more than 50 percent of their time in any one state. Then the court looks to see where the individual is based. And that, Your Honor, satisfies the test. Here it's undisputed, we would submit, that the flight attendants here do not spend more than 50 percent of their time in any one state. And they're all based by, as Judge Smith just noted, by the very definition of the class itself. So, Ward and Oman directly control those provisions. Now, with respect to overtime, the overtime rule, well, before I get to that, let me address Counselor Bergen's point about these bases perhaps not being nominal and that there were people who were not actually flying in and out of their base. I've got two points to make about that, one factual, one purely legal. It is very clear, Your Honor, we submit to you from Oman that the only legally significant question is whether or not the parties and the airline has designated the flight attendant's base in one particular place. Here's what Oman said, as it rejected the argument that the court's base of operations test would be unworkable because of the shifting nature of base assignments. This is what it said. If the employee's base of operations changes because the employee is assigned to a different home airport, it will be a small matter to determine whether Section 236 now applies. And yes, it will be a small matter because it's controlled by the question of where has the airline assigned the flight attendant as the base. Now, it's true that there are isolated instances in which Virgin Airlines, like United, like Delta, like every other airline, Your Honor, allows or accommodates a flight attendant and allows that flight attendant temporarily to fly in and out of some place other than their base. But even when that is happening, and when it happened with respect to Bernstein, the base was always the place where the airline, Virgin, could insist that the flight attendant appear and present to begin work. And it was always the place where the flight attendant had to, on his or her own dime, travel to and lodge at in order to present for work if they didn't reside approximate to that. Now, on the factual issue, there are, the record is clear from Virgin's own textbook, that out of 1,700 class members during the class period, only 20 had pairings that predominantly originated at some airport other than a California airport. But how many, how many out of 1,700? Your Honor, and that point can be found at ER 246 and 273. And even when Bernstein was permitted to live temporarily in New York and pair out of JFK, he flew in and out of California airports 95% of the time. So this notion is really a red herring. It's not factually accurate, but it doesn't matter because it's the base assignment that controls under California law. Let me speak to overtime laws, Your Honor. One thing is, it is quite clear from Ward and Omon that they support the district court's application of the overtime laws to this case for two reasons. First, Ward specifically reaffirmed the holding in Sullivan that California's overtime laws to non-resident employees of a California employer, when those employees work in California for four days and weeks at a time, those overtime laws apply. The second but more important point I want to make about Ward is that it derived its connections to California test, a test where it says that California must have the most important relationship to the work in order for our laws to apply. That test, it derived from Sullivan. It derived it from Sullivan. And the test, by the way, is materially indistinguishable from the test that Judge Tiger did apply below. He applied the... Let me ask you this. I don't want to interrupt your Omon and Sullivan discussion, but are there any California-related legal issues in this case that you believe our panel needs to refer to the California Supreme Court for a determination? And if so, which one? Your Honor, this is something on which I agree with counsel Pervergent. I don't think these questions that are before you are hard ones. There's only one, really, that isn't answered by California law, either by Ward and Omon on the 226 and 204 claims. Those are easy. So bottom line is that based on the law that we already have, our panel is in a position to determine what the California Supreme Court would like to do, which, of course, we're permitted to do, and not send anything back further delaying the case. That is our position, Your Honor. And again, it's because the 226-204 issues are decided. The court, the Ward and Omon court embraced Sullivan, and Sullivan controls the overtime issue, Your Honor, because it's just very clear that the overtime laws apply to a California-based employee of a California-based employer. Sullivan makes clear... Can I ask you one other, if you will, housekeeping question? We had the request of the party consolidated this in the attorney fee appeal. Do you agree that if for any reason we send any portion of this case back to the district court, if the whole attorney fee issue basically goes away and we start all over again on the attorney fee? I know you don't want to hear that, but that's my question. Your Honor, this is one that I'm going also to have to defer to my colleague. You're over your time now, I believe. You and Ms. Olivier are sharing the 30 minutes, right? Yes, we are, but I'm going to ask Ms. Olivier to indulge me just one minute of her time, 30 seconds of her time, because I want to say that if the court agrees that the question of whether or not the overtime, California's overtime rules, apply here under a proper application of the Sullivan case, which we submit that Judge Tiger did make with his deep ties to apply, just because it wouldn't make any sense for California law on overtime would not also, that overtime wouldn't be calculated on regular wages that were also controlled, Your Honor, by California minimum wage law. So with that, Your Honor, I do now turn the podium over to Ms. Olivier and thank you. Very well. Ms. Olivier, please proceed. Thank you, Your Honor. Let me dive right in. I want to follow up on a couple of the points that Mr. Cooper made and then get to your questions about the case. So with respect to the application of California law, there is no question that California law applies to all the claims here. Counsel for a virgin suggested that we would look, if you didn't look at the contract, which I submit, I appreciate the court's attention to that. The contract does, in fact, identify California law, and that's a contract that was drafted by a virgin. Counsel for a virgin said, looking at the contract, you would look for the surrounding circumstances. So let's just talk for a second about the surrounding circumstances that exist here. This is a California corporation that chose to base itself in California because it got millions of dollars to do so. Until 2014, it had its entire workforce, all flight attendants, based in California. After 2014, it had no more than, according to Virgin's own expert, no more than 20 flight attendants that were starting their flights in and out of JFK, which was the only base after 2014 outside of California. Those individuals are excluded from the class in any event. So the case here, the California employer and California-based employee, and the only people who are seeking time to recover any time work out-of-state are California residents as well. To your question, Judge Smith, about whether there is a labor code case on point, there is not a case that deals with labor code section 201 to 203. There is a labor code. There's a case that involves labor code section 1102.5, which is the labor code retaliation provision, and that's cited in our brief at page 33. It's the Liebman case, and the site is 201 Westlaw 3823954. That's the Central District of California case, and that case looks at the fact that although that individual was working abroad, California law applied because that is where the determinations were made, and that I would submit that that case is also on point because we have here a California corporation making all of its pay decisions from California and governing a California workforce. You would also look at the fact that, as I said before, Virgin took state money and made the choice to base itself in California. Judge Tiger looked carefully at all of those factors when the district court determined that California law would apply to all the claims, and to Virgin's counsel's position that this would be a sweeping change in the law, that's simply not the case because, as we know, federal wage law sets a floor, not a ceiling, for wage protections, and so there really isn't—there is no change here that it is absolutely in keeping with the principles of federalism and the federal laws at issue here that state laws regulate, and wage and hour is a typical traditional area of state law regulation. To turn, Judge Smith, to your question about the pay structure, Virgin is incorrect, and the record shows very conclusively that the pay structure here is the opposite of the pay structure in Delta and violates OMON for that very reason. The pay—for several reasons, but let me go into that. First of all, Virgin promises to pay an hourly rate. The letter that it sends to its employees states, quote, you will be paid on an hourly basis, and I'm going to direct the court to supplemental excerpts of record at 833. So the promise at the outset is to pay the flight attendants an hourly rate. Flight attendants understood that they were being paid an hourly rate. There are declarations in the record that discuss that. Those are uncontested. The wage statements identify an hourly rate. The work rules identify an hourly rate, and the crew pay manual states that crew members are paid for, quote, credit hours, and that crew members are not paid for time on the ground. They're only paid for what's called block time, which is essentially flight time. Those sites that Virgin's counsel points you to, frankly, just support our position because either way, if you view Virgin's pay structure as a formula in the sense that it promised to pay for a duty period or a bid month, either way, it either promised to pay by the hour or if it paid by the formula, that formula did not because Delta had something called a one-for-two duty credit, and the Oman court very carefully reviewed that, and it is the exact same analysis that Judge Tiger did in this case and found that in contrast to Delta, Delta had a formula where it added up all of the hours in the duty period and then divided them by the flight rate, and in that way, if the duty period lengthened, it would be ensured that flight attendants would continue to get pay. We don't have that situation here. A flight attendant could work an additional five hours before or after a flight. They could be at ground holding at the gate for five hours. There is nothing in any formula that compensates Virgin for, that compensates the flight attendants for any of that time, so we would submit under the very clear and direct holding of Oman the pay structure that Virgin has here, whether you look at it as a by the hour formula or by any sort of pay period formula does not comply with Oman, and keeping in mind that Oman embraces the California Court of Appeal decisions, all of which do talk about how averaging is unlawful in this very way. Can I add just kind of following up what you're saying? Do we have to separately analyze each California statute that you allege Virgin violated to determine whether that particular statute applies to the class and subclasses? Excellent question, Your Honor. I would say that Ward does suggest that you do that, but the good news is it's an easy task because the way that Ward makes that straightforward and simple is Ward resolves the wage statement and timely pay claims, the 204 and 226 claims. The test that Forth and Ward is the test that applies here, and it's clear under that test that California law applies. Then you look at overtime, minimum wage, and the breaks claims. Those are all governed by Sullivan. Ward reaffirms Sullivan, and all you would need to look to, and our supplemental brief, I think, sets this out very succinctly. All you would need to look to is the basis for those laws. It's clear in California the wage order specifically applies to flight attendants. So there is certainly an intent on the part of the legislature to have the labor code, those specific provisions, just like 226, apply to flight crew. And then you look at the fact that the vast majority of these individuals are based in California, again working for a California employer, and the vast majority of time that's being sought to be recovered is time that was worked on the ground in California. So while I think that Ward directs that the court should look at each labor code provision, it really need only look at Ward for 226 and 204 and then to Sullivan for the remainder of the claims, and California law would apply to all of those claims. You did ask a question about the plea. The answer is no, and we did know you would not need to reverse that order, because as these claims are all wholly integrated, as can be seen very clearly from the district court record, if there is any affirmance of any of the main claims in the case, it would be, you know, plaintiff's counsel would submit that there would be no reason to revisit the issue. But with respect, that's like a perfect judge, but you've got several different claims wrapped here in a rather complex case. Let's just say hypothetically, again, just arguendo, that we found that, say, the wage and hour portion is preemptive, and involves a fair amount of money. If we send that back, doesn't that change the entire calculation that was made about attorney fee? It shouldn't, Your Honor, because I assume you're addressing the brakes claims. The brakes claims in terms of, I can tell you, the brakes claims in terms of counsel time is part and parcel of the remainder of the claims in the case. And under, you would do that analysis under California law, and California law very clearly states that the extent that these claims are intermixed, you would not, the defendant would not get a discount by virtue of the fact that there was some amount of time spent on claims that ultimately were unsuccessful. You would only do that under California law in the case of claims that were very distinct, which is plainly not what we have here. They're all intermingled. Okay. Let me ask my colleagues whether either has any additional questions, either for Mr. Cooper or Ms. Olivier, before we thank them for their presentation and go back to Mr. Dvorsky. I'm fine. Thank you, Judge Smith. I'm good, too. Thank you very much. Very well. Well, thank you both for arguing for Ms. Bernstein at all. And let's turn back to Mr. Of course. There's one question that I was getting to when talking earlier to the government attorney. I'm not a great believer that you have to have one rule throughout all the 50 cases in every 50 states in the area. But there does come a time when it's more convenient to have the same rule apply across. And when you have flying from California to New York, maybe one of those times. And is there, under your understanding, is there any problem that we have that we have to deal with that issue? In terms of applying California law to someone who may be flying from California to New York, Your Honor? That's right. There is not. And the reason for that is because if you look at the California-based employee, you never have a circumstance where that individual is going, where another state is going to be asserting a right to apply its law to that individual who's flying from California to another state. And in fact, Virgin never makes that argument because, of course, Virgin's position is that no state's laws should apply. But we know that to not be the case because the federal wage law explicitly says it's a floor, not a ceiling. So while I appreciate that there could be circumstances in which that might create some sort of conflict, that conflict is not present on the record here because of the strength of the ties of both the workers and the employer to California. Okay, thank you. Other questions by my colleague? Okay, very well. So let's now go back to Mr. Dobrowolski, who has some additional time to rebut. Thank you, Your Honor. Let me start with the question that the court was asking earlier about the contract. The contract that I think the court's referring to are at SCR 1265 to 1268. The plaintiffs cite those contracts in passing in their brief. They don't actually argue that there is a choice of California law provision that governs here. And for good reason. Those contracts are entitled Employee Invention Assignment and Confidentiality Agreement. Those are IP contracts. Paragraph 22, sorry, Paragraph 1 of the contract makes that clear. Paragraph 22 of the same contract makes clear that those are not employment contracts. The employment relationship is governed by the work rules. Those are the excerpts of record cites that I was giving earlier with respect to the minimum wage claims. And the work rules don't have any sort of a choice of law provision like this. And so there isn't a choice of law provision that applies here. All of the choice of law are related to IP issues, right? Correct, which are not an issue in this case. Presumably why this argument wasn't pressed. With respect to the meal and rest break claim and guilt, there's an obvious difference between the trucking industry and the airline industry. Truck drivers can take a rest break on the side of the road that only increases costs and only interrupts schedules in a modest way. It would have a much bigger impact on the airline industry for flight attendants to have to take breaks mid-flight or even on the ground causing flight delays. And so those are not on point here in this industry. With respect to Ward and to go back to Judge Smith's earlier question, the California Supreme Court in Ward at footnote 8 makes clear that the leading California cases, Tidewater and Sullivan, just don't address a situation like this where you have transportation workers who don't principally work in any one state. So Ward itself is the leading authority on that. There isn't, as far as I know, other California authority directly on point. The one case that Ms. Olivier cited is the Central District of California case. It's not a California State Court or a California Supreme Court case. Ward itself rejects a number of the factors that, it expressly rejects the Bernstein test, but it also expressly rejects a number of the factors as simply not pertinent, including employer location, employee residence, receipt of pay, payment of taxes. The touchstone under Ward is where is the principal place that the work was performed? In that sense, it does reaffirm Sullivan, but Sullivan stands for the proposition that California law applies where the plaintiffs are performing full days or weeks of work at a time in California. That simply is not what we have here. Now it's true that Ward for 226 purposes also created an exception just for that statute for where the flight attendant is based, but the court in Ward was using that term in a very particular sense. It defines based to mean that California serves as the physical location where the worker presents for work. And here, again, Ms. Bernstein herself did not typically present for work in California. She did so in New York, and we don't know because the plaintiffs haven't argued and the district court didn't ask where the other class members presented for work. And so whether we're talking about, for 226 purposes, that upends the district court's judgments. And for purposes of the other California law provisions, if we're talking about choice of law, Ward's touchstone is where was the work principally performed, not any of the other factors that the district court relied on. With respect to the pay formula, the formula uses an is compensating for the entire bid period. That, again, is the import of the earlier citations that I provided to the court in my opening argument. And once you have a compensation formula that applies to the entire bid period, that's permissible under California law as long as the average rate is higher than the minimum wage, even if, and I'm quoting from Oman here, there are on-duty periods to which the flight time formula does not directly attribute compensation. End quote. That's Oman at 466, Pacific 3rd at 339. So it doesn't matter that we have a formula that is based on an hourly rate if that formula is compensating for the entire bid period. Lastly, with respect to the attorney's fees, the standard practice, as Judge Smith's questions were suggesting, is to vacate whenever any part of the judgment is set aside, and that's what should be done. I don't want to take up too much time on this question, but Mr. Dvoretsky, I've been asked to present at a CLE on some of the Zoom arguments and the like, and I'd just like to know who that bobblehead is. That's what I thought. And then on the to your left shoulder on the top, you would have a picture of a person and a dog given equal billing. If you look at the entire background, there are far more pictures of the person than of the dog. But you're not equating them by putting them in that dual frame. Okay. All right. Now, you know, Judge Miller on the Ninth Circuit presented at a Bar Association function and talked about Blair Witch arguments, where the background is so awful that it makes you feel like the devil is involved. That's a very nice background. I'm going to blame my wife for this, because I asked her this morning, should I take down the pictures? And she said, no, they look nice. Leave them up. Good show. Thank you. Well, on that profound point, we thank you all for your arguments have been very helpful, and we compliment you all for your argument. The case disargued is submitted, and the court is adjourned for the day. That's the attorney's fees. We already did. You want to invest it again? Oh, we've already done enough. That's fine. It's part of the same case. No, it's fine. Please do, if you have a question. Now's the time. No, I was just, if they haven't, I did not assume that we were covering it together. Yeah. If you want to ask additional questions. I wanted to make sure that they got an opportunity to talk about everything, so we don't have to come back tomorrow and finish. No, they did, and the one side said yay, and the other side said nay. This is a big surprise. Very well, as I said before, thank you very much for your argument. The case is argued and submitted, and the court stands adjourned for the day. Thank you.
judges: Wallace, M. Smith, Lasnik